## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| v. | :   **CR. NO. 18-053 (KBJ)** |
| | :        **and 20-113** |
| **FIROZ PATEL,** | : |
| | : |
| **Defendant.** | : |

### STATEMENT OF THE OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and defendant Firoz Patel, with the concurrence of his attorney, agree and stipulate as follows that at times relevant to this matter:

### Background

1.      A money transmitting business was one which transferred funds on behalf of the public by any and all means, including electronic transfers within the United States or to locations abroad.

2.      Money transmitting businesses were required to be registered with the Financial Crimes Enforcement Network ("FinCEN").

3.      Money transmitting businesses were required to be licensed in each state where the failure to do so is punishable as a misdemeanor or a felony under state law.  The District of Columbia Money Transmitters Act required all money transmission businesses to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia. Pursuant to D.C. law, a violation of this statute was a felony punishable by a fine of not more than $25,000, imprisonment of not more than five years, or both.

1

4.      The Bank Secrecy Act required money transmitting businesses to conduct due diligence of its customers, maintain corporate records, and implement anti-money laundering principles.

5.      Pyramid schemes were scams in which the organizers promised the victims profits based primarily on recruiting others to join the scheme.  Because little or no wealth was created, few or no products were sold, minimal or no investments were made, and few or no services were provided, the schemes eventually failed.  Minimal or no product Mutli-Level Marketing (a/k/a "MLM") scams and Money Cycler scams (a/k/a "Cyclers") were types of pyramid schemes.

6.      A Ponzi scheme purported to be an investment opportunity, but payouts came almost exclusively from new investor money instead of the returns of the underlying investment, if any. Ponzi schemes inevitably collapsed as investors ran out of new victims to recruit and the underlying investment generated insufficient or no revenue to sustain the scheme.  A High Yield Investment Program (a/k/a "HYIP") was a type of Ponzi scheme.

## AlertPay

7.      In or about 2004, Firoz Patel and Ferhan Patel founded AlertPay in Montreal, Canada.  AlertPay acted as an online money transmitting business.  That is, it was an online service that allowed persons and businesses to transfer funds electronically.  AlertPay claimed to have been used by millions of members worldwide, including in the United States.

8.      Many of the merchants that AlertPay accepted as customers did not go through a full compliance review, which meant that a full due diligence analysis could not be completed.  In those instances, the compliance team would simply approve the Know Your Customer ("KYC") information.

9.      Firoz Patel knew that AlertPay was transmitting illegal proceeds based in part on statements made by co-conspirators, as well as his review of customer data.

10.     Firoz Patel was aware of this illegal money laundering and spoke with co-conspirators about it. Specifically, the co-conspirators and Firoz Patel discussed that AlertPay was taking on MLMs, Cyclers, pyramid schemes, and Ponzi schemes as customers.

11.     AlertPay used a software program, on at least one occasion, to conduct an automated compliance check of its customers.  The software flagged many of AlertPay's merchants and found numerous compliance issues.

12.     Co-conspirators would find merchants that were MLMs and other companies that would trigger compliance violations.  These MLMs would be removed from reports of AlertPay's merchants. Firoz Patel would send these sanitized reports to third parties who raised questions about AlertPay's customer base.  Often AlertPay had to clean up its customer list because third parties were concerned that AlertPay took on high risk merchants.

13.     AlertPay had Cyclers on their platform, which AlertPay staff understood to be another way of saying Ponzi schemes.  Many of the Cyclers were MLMs selling technology products, but no actual physical products.

14.     AlertPay employees would log onto their personal AlertPay accounts and make financial transactions with high-risk merchants.  Specifically, Firoz Patel was participating as a customer in at least one of the Ponzi schemes for which AlertPay was providing money transfer services..

15.     AlertPay had been processing transactions for a steroids distributor for several years. Ultimately, co-conspirator Firoz Patel was the subject of a money laundering indictment based on AlertPay's active facilitation of the illegal sale of steroids.

16.     Firoz Patel did not want to cut out high-risk merchant customers for fear that a competitor money transmitting business would get them.

17.     AlertPay did not have a license to operate in any state in the United States or the District of Columbia. In spite of this lack of licensure, AlertPay offered its services in virtually every state in the United States and the District of Columbia.

18.     Firoz Patel was aware that AlertPay received a cease and desist letter from regulators in New Hampshire. The cease and desist letter was ignored by Firoz Patel.

19.     Co-conspirator Firoz Patel implemented this plan (i.e., only disabling new customer signups) on numerous occasions in response to cease and desist letters from other state regulators. This plan was meant to conceal AlertPay's unlicensed activity from state regulators, who often conducted spot tests by attempting to sign up as a new customer after sending a cease and desist letter.

20.     AlertPay received letters from numerous state regulators inquiring about its unlicensed activities; however, Firoz Patel allowed AlertPay to persist in operating in those states.

21.     In 2011, AlertPay hired a U.S. compliance company ("U.S. Compliance Company 1") to conduct an audit of AlertPay as to compliance issues, which included licensing deficiencies.

22.     U.S. Compliance Company 1 shared materials with AlertPay on the need to have licenses and how to get them. The consultants told Firoz Patel that AlertPay was illegally operating without a license in at least 45 states and the District of Columbia.

23.     In or about October 2011, the consultants warned that AlertPay must immediately shut down all U.S. operations, because they were violating U.S. law. Firoz Patel refused to terminate U.S. business. On November 9, 2011, one of the consultants emailed Firoz Patel, that AlertPay was operating in violation of at least five cease and desist orders from state regulators, and that the consultant could not work with Firoz Patel any further due to these criminal violations. Firoz Patel ultimately terminated the contract with the consultants.

24.    AlertPay conducted hundreds of millions of dollars in unlicensed transactions.

### Transition from AlertPay to Payza

25.    In early 2012, Firoz Patel purchased MH Pillars.  A co-conspirator discovered MH Pillars, a company in the United Kingdom that was already registered and established in another name, and purchased it.  Firoz Patel caused Ferhan Patel to seek out a previously established company, so that it would appear that MH Pillars had a track record, as opposed to a brand new company that was only founded to serve as a front.

26.    In early 2012, MH Pillars, doing business as Payza, claimed to have purchased AlertPay.  AlertPay accounts were transitioned to Payza accounts.  The AlertPay website directed customers to Payza's website.

27.    Firoz Patel was listed as the Executive Vice President of Payza, however, he was the most senior person at the company and ultimately, all employees reported to him.

28.    No substantive changes took place during the rebrand.

29.    On or about September 27, 2012, Firoz Patel stated that "AlertPay and Payza are NOT the same and that is what we need to impress upon all people." Firoz Patel made this statement after a payment processor said that "AltertPay/Payza was 'well known' for processing for illegal sites." Firoz Patel purposely attempted to deceive financial institutions into thinking that Payza and AlertPay were different, when in fact they were not.

### Partnership with Obopay, Inc.

30.    Obopay, Inc. ("Obopay") was an internet-based payment platform that specialized in mobile banking through the use of a cellular phone or other portable device. Obopay provided numerous financial services to its customers, including money transfer services, mobile and online commerce, bill payments, and disbursements. Obopay was registered with FinCEN as a money

transmitting business. Although Obopay had also been licensed in numerous states, all of its licenses have lapsed over time; for instance, Obopay was licensed as a money transmitting business in approximately 40 states at the end of 2012, which number went steadily down in 2013. Ultimately, Obopay surrendered its licenses in every remaining state in 2014 and subsequently ceased all operations.

31.     Pursuant to federal and state law, licensed money transmitting businesses may take on delegates that may operate under the umbrella of the parent's licensure.

32.     While AlertPay was transitioning to Payza, Payza began negotiations with Obopay to become a delegate. On March 28, 2012, Obopay entered into an agreement with MH Pillars Incorporated. The agreement appointed Payza as an authorized delegate of Obopay and in turn required Payza to provide Obopay with complete information necessary to perform the regulatory compliance services of a money transmitting business. The agreement also specified that Payza would comply with all legal requirements including, but not limited to, state money transmission laws and regulations relating to currency reporting and the prevention of money laundering, such as the Bank Secrecy Act. The agreement contained a list of the states where Obopay was licensed to operate.

33.     When it entered into an agreement with Obopay, nearly all of AlertPay's/ Payza's business in the United States was done in violation of U.S. law, because AlertPay/ Payza had no state licensure at that time. At least $10,000,000 was illegally transmitted via AlertPay/ Payza.

34.     When state regulators would direct Payza to end all activity in their state, Payza would, at best, only turn off new signups, but still allow existing customers to continue transacting. By only shutting down new sign ups, Firoz Patel created the appearance that Payza was complying with the states' orders, when state regulators would attempt to sign up with undercover accounts

35.     Firoz Patel engaged in numerous discussions with co-conspirators regarding the states that Payza could not operate in; however, they disregarded this legal prohibition. Firoz Patel permitted money transmissions to take place in all states, including after receiving cease and desist orders.

36.     For example, California regulators sent Payza a cease and desist letter in September 2012, ordering Payza to cease all operations in California. On or about September 26, 2012, Firoz Patel asked Ferhan Patel for a copy of the cease and desist letter from California. Payza continued to operate in California in spite of the letter which stated, "YOU ARE HEREBY WARNED TO CEASE AND DESIST FROM RECEIVING MONEY IN THIS STATE FOR THE PURPOSE OF TRANSMITTING THE SAME OR ITS EQUIVALENT."

37.     On or about November 1, 2012, Ferhan Patel sent Firoz Patel a breakdown of funds sent and received, as well as fees earned from California transactions. The data showed that in October 2012, Payza sent/received approximately $1,156,412 for customers for which it collected $27,856 in fees. All such transactions were in violation of the cease and desist order.

38.     Payza would sanitize customer lists being provided to Obopay, so as to remove known illegal merchants. This included the removal of merchants such as Ponzi Scheme 1 and Ponzi Scheme 2 (described below).

39.     From at least July 2011 to March 2013, AlertPay/ Payza transmitted millions of dollars to the United States from Canada and conversely to Canada from the United States, including via U.S. Bank 1.

40.     On or about May 10, 2013, Firoz Patel received an email stating that Obopay had "officially asked that we cease activity in states where they are unlicensed." However, Payza refused to end such unlicensed activity.

7

41.     On or about June 3, 2013, Obopay severed its partnership with Payza.

## Laundering of Funds by Payza

42.     Firoz Patel was aware that a subordinate was being blocked from seeing accounts in Payza's online records/databases.

43.     Merchants were not removed from Payza's platform for being involved in high risk activities.  The criteria for customer removal was focused on whether the merchants posed a financial risk to Payza, i.e., the merchant had a high chargeback rate from failed transactions for which Payza then had to compensate its customers.

44.     According to at least one employee, Firoz Patel directed her to seek out "shady" merchants.

45.     Payza did not have a Bank Secrecy Act officer, nor did it conduct legally required Bank Secrecy Act/anti-money laundering audits.  A co-conspirator discussed concerns about these issues with Firoz Patel.

46.     Two co-conspirators described "Cyclers" as a form of Ponzi schemes to Firoz Patel and asked him whether these merchants should be shut down.  Firoz Patel responded not to shut them down.

47.     In fact, Payza had numerous merchants that were Cyclers, which Firoz Patel knew to be Ponzi/pyramid schemes. Frioz Patel knew that "gifting" merchants were also Ponzi schemes that Payza should not have on its platform for anti-money laundering reasons.

48.     Merchants were not removed from Payza's platform for being involved in high risk activities.  The criteria for customer removal was focused on whether the merchants posed a financial risk to Payza, *i.e.*, the merchant had a high chargeback rate from failed transactions for which Payza then had to compensate its customers.

49.     Firoz Patel and other co-conspirators were sanitizing the list of customers to remove known illegal merchants, before producing that information to third parties requesting customer information. For example, in a series of emails during May 2013, a co-conspirator informed Ferhan Patel that the co-conspirator was going through the customer list to get a cleaned up merchant list. In order to do this, he was looking for "any merchants who have gross violations such as adult, gambling, drugs, violence ect. [sic]. And what I think is the tricky part: Identify MLM's that are set up as obvious illegal Pyramid schemes."

50.     In August 2012, Firoz Patel directed co-conspirators to falsely tell a payment processor that Payza no longer supported HYIPs, when in fact Payza retained numerous HYIPs.

51.     In February 2013, Firoz Patel received an email with Payza's "Merchant Risk Guideline." A co-conspirator wrote comments in the document identifying all the internal compliance failures that did not match their high risk guidelines manual. This included specific failures in relation to preventing the taking on/servicing of pyramid and Ponzi schemes.

### Egopay – Money Transmitting Business Established by the Patels to Launder Money

52.     Payza struggled to maintain its relationship with financial institutions, which Payza needed to facilitate payment processing, because Payza so frequently was found to have customers engaged in illegal activity.

53.     Firoz Patel set a deadline for getting all of the high risk income programs off of Payza's books and onto the new company's books. This new company would be called Egopay.

54.     In or about May 2012, a co-conspirator registered Egopay under the name of E-Commerce Worldwide in Belize. Firoz Patel had all shares in E-Commerce Worldwide issued to AlertPay.

55.     On or about July 17, 2012, Firoz Patel and Ferhan Patel edited an email which was to be sent to high-risk Payza customers to migrate their accounts to Egopay. This email would purportedly come from Egopay, when in fact Firoz Patel and Ferhan Patel had authored it.

56.     A co-conspirator conducted work on the Egopay platform from within Payza's offices.

57.     In or about September 2012, Firoz Patel removed his name as the director of E-Commerce Worldwide in corporate records, and substituted the name of a nominee director.

58.     On or about July 15, 2012, Firoz Patel asked several co-conspirators for "a final list of businesses that we told to leave us and move to Ego[pay]," because he wanted to ensure a smooth transition.

59.     Once Egopay started taking on customers, the list of merchants Payza moved to Egopay was expanded to include additional high-risk customers.

60.     On or about March 27, 2013, co-conspirator Ferhan Patel told co-conspirator Firoz Patel that Egopay was a problem in the U.S. because Egopay collected no customer due diligence data which created obvious money laundering concerns.

61.     On or about May 1, 2013, a co-conspirator warned Firoz Patel that state regulators would reach out to ask Pazya why it had Egopay acting as an unlicensed money service business in Payza's portfolio.

62.     On or about May 29, 2013, Ferhan Patel admitted to Firoz Patel and other co-conspirators that Egopay was not licensed anywhere but was registered with FinCEN, and that the risk of using an exchanger, such as Egopay, was that there was no visibility into due diligence because Payza would not know who the party was that was sending the transaction. In spite of these

known money laundering problems, Firoz Patel continued to allow Egopay to operate freely via the Payza platform.

63.    On or about March 27, 2013, Ferhan Patel admitted to Firoz Patel that Egopay was "classified as an msb [money service business] by new fincen regs this week…. They do no KYC [know your customer]."

64.    Ultimately Egopay was shut down by regulators in Belize, after which Payza began again directly servicing many of Egopay's customers.

## Customers of Note

A.    Brian Wainstein

65.    Wainstein's drug operation utilized several internet websites to advertise and sell anabolic steroids.  These websites instructed customers to pay for their drug orders via online transfers using AlertPay as early as 2006.   Wainstein directed his customers to use AlertPay because it was not as cooperative with law enforcement as other money remitters.

66.    By 2008, Wainstein was selling over $500,000.00 worth of illegal steroids a month.

67.    Wainstein used AlertPay to launder the proceeds of his illegal steroid sales.  For example, between July 20, 2006 and July 9, 2008, Wainstein made at least eighteen wire transfers totaling an amount of $766,827.49 from his AlertPay accounts to offshore Austrian bank accounts.

68.    Firoz Patel and Wainstein had numerous email conversations about Wainstein's sale of steroids.  Firoz Patel knew that the funds AlertPay was processing were the proceeds of such sales.  For example, in November 2009, Firoz Patel communicated with Wainstein about Wainstein's business "steroideshop.com" and "AXroids.com"

69.    Firoz Patel personally directed transfers of money for Wainstein, including the above-described transfers to the Austrian bank accounts.

B.   Ponzi Scheme 1

70.   One example of a Ponzi scheme that operated using Payza was "Ponzi Scheme 1."

71.   In early 2012, Payza's European payment processor questioned Payza about Ponzi Scheme 1. The payment processor became aware of Ponzi Scheme 1 because customers were complaining about the merchant.

72.   Ponzi Scheme 1 was run by Person A.

73.   On or about June 26, 2012, the payment processor again inquired as to whether Payza had removed Ponzi Scheme 1, as Ponzi Scheme 1 had been blacklisted by securities agencies as an illegal investment scheme. A co-conspirator shared this information with Firoz Patel, and asked Firoz Patel if they could terminate Ponzi Scheme 1's Payza Account. Firoz Patel refused to do so.

74.   After Ponzi Scheme 1 was ultimately shut down by regulators, Firoz Patel referred Person A to Egopay to provide services to Ponzi Scheme 1's new spinoff. This new Egopay account allowed the illegal enterprise to continue operating.

75.   On or about July 6, 2012, Firoz Patel informed a co-conspirator that Ponzi Scheme 1 would be changing "in about 2 weeks" to a new name.

76.   On or about July 20, 2012, Person A attempted to fund his new Egopay account with at $1.5 million transfer from his Payza account. Firoz Patel personally authorized this transfer. Payza made approximately $58k in fees by moving Ponzi Scheme 1 to Egopay.

77.   Firoz Patel was aware that Ponzi Scheme 1 was a Ponzi scheme. Firoz Patel, knowingly allowed Ponzi Scheme 1 to transmit its illegal proceeds via Payza and then Egopay. Ponzi Scheme 1 used Payza and Egopay to defraud its customers and promote its illegal activities

by transmitting payments to and from victims of the scheme, and by allowing Person A to transmit funds for Person A's own enrichment.

      B.     <u>Ponzi Scheme 2</u>

      78.     Ponzi Scheme 2 is another example of the use of Payza to launder Ponzi scheme proceeds.

      79.     On June 9, 2012, Firoz Patel told a co-conspirator that Firoz Patel wanted to meet to discuss what they could do to make Ponzi Scheme 2 "more comfortable with us."

      80.     On or about August 3, 2012, Firoz Patel caused Ferhan Patel to discuss with a co-conspirator whether or not she had ever spoken to Ponzi Scheme 2's operator about moving the company offshore, to which the co-conspirator responded there had been a "very delicate conversation regarding this."

      81.     On or about August 17, 2012, the Securities and Exchange Commission ("SEC") filed a civil complaint in the United States District Court for the Western District of North Carolina against Ponzi Scheme 2 and Person B for the operation of an estimated $600,000,000 Ponzi and pyramid scheme. Payza received a copy of this complaint. Ferhan Patel spoke to co-conspirators about this complaint.

      82.     AlertPay and Payza collectively processed approximately $340 million worth of transactions related to Ponzi Scheme 2 before it was shut down.

      83.     The Payza customer support team spent most of their time dealing with Ponzi Scheme 2's customers. A significant amount of Payza resources were devoted to Ponzi Scheme 2.

      84.     Co-conspirators and Firoz Patel anticipated that Ponzi Scheme 2 would be eventually shut down by law enforcement.

85.    Prior to the SEC's action, Firoz Patel was aware that Ponzi Scheme 2 was a Ponzi scheme.  Firoz Patel allowed Ponzi Scheme 2 to transmit its illegal proceeds via Payza.  Ponzi Scheme 2 used Payza to defraud its customers and promote its illegal activities by transmitting payments to and from victims of the scheme, and by allowing Person B to transmit funds for Person B's own enrichment.

## Conclusion

86.    As part of this conspiracy, Firoz Patel and others caused over $250,000,000 to be illegally transmitted.  Additionally, these co-conspirators failed to conduct proper due diligence of their customers.

87.    All of Firoz Patel's actions in furtherance of the offenses charged in this case, including the acts described above, were done willfully, knowingly, and with the specific intent to violate the law.

88.    The foregoing statement of the offense is a summary of the principal facts that constitute the legal elements of the offenses charged in this case.  This summary does not describe all of the evidence that the government would present at trial or all of the relevant conduct that would be used to determine the defendant's sentence under the Sentencing Guidelines and Policy Statements.  Firoz Patel acknowledges that the foregoing statement of the offense does not describe all of his conduct relating to the offense charged in this case.

Respectfully submitted,

_____
ZIA FARUQUI
Assistant United States Attorney
555 4th Street, N.W., 5th Floor
Washington, D.C.  20530

(202) 252-7117 (Faruqui)
Zia.Faruqui@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: _July 8, 2020_                                 _____
                                                     Firoz Patel
                                                     Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: _7/8/20_                                       _____
                                                     Danny Onorato
                                                     Attorney for Defendant Firoz Patel

16